IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LORRIE CLARKSON,<br>    Plaintiff,<br><br>v.<br><br>HARRISBURG AREA COMMUNITY<br>COLLEGE; PENNSYLVANIA TASK<br>FORCE 1; KEN PAGUREK, JR.,<br>individually, BRIAN BOOTH individually;<br>and BOB STAKEM individually,<br>    Defendants. | Civil Action No.: 2:22-cv-3247 |

## CIVIL ACTION--COMPLAINT

PLAINTIFF, LORRIE CLARKSON, respectfully alleges the following claims, as for her complaint against the above captioned Defendants, upon information and belief as follows:

## NATURE OF THE CASE

Plaintiff complains pursuant to Civil Rights Act of 1964 § 7, 42 U.S.C. § 2000e *et seq.* (1964); the Pennsylvania Whistleblower Law for Retaliation and Hostile Work Environment, 43 Pa. Stat. Ann. § 1423; Disability Discrimination under the American with Disabilities Act of 1990, 42 U.S.C. § 12101 *et. seq* (hereinafter, the "ADA") and the Pennsylvania Human Rights Act, PA 1955 Act 222 *et. seq* (hereinafter, the "PHRA") (perceived and actual); Violation of Pennsylvania Common Law (Intentional Infliction of Emotional Distress).

## JURISDICTION AND VENUE

1.     Jurisdiction of this action is conferred upon this Court as this action involves a Federal question under Civil Rights Act of 1964 § 7, 42 U.S.C. § 2000e et seq (1964), Title 42 USC, Chapter 21, Subchapter 1 Section 1983, and Title 42 USC, Chapter 126, the American Disabilities Act (hereinafter, the "ADA").

2.     This Court also has supplemental jurisdiction over the state causes of action.

3.      The Plaintiff is a citizen of the Commonwealth of Pennsylvania residing within venue of this Eastern District of Pennsylvania District Court.

4.      Defendant Harrisburg Area Community College and Pennsylvania Task Force 1 are entities residing within venue of this Eastern District of Pennsylvania District Court.

5.      Defendants Ken Pagurek, Jr., Brian Booth, and Bob Stakem are individuals residing within venue of this Eastern District of Pennsylvania District Court.

6.      Venue is proper in this district since the Plaintiff was employed and supervised by the Defendants within the Eastern District of Pennsylvania.

7.      The matter in controversy exceeds $75,000.

## PARTIES

8.      Plaintiff, Lorrie Clarkson (hereinafter, the "Plaintiff" or "Clarkson") resides in the county of Philadelphia, Pennsylvania. At all material times relevant to this action, Clarkson was employed as a HACC and PATF1, as a FEMA Grant Administrative Specialist.

9.      At all material times relevant to this action, Defendant, Harrisburg Area Community College (hereinafter, "HACC"), s a domestic for-profit community college duly existing under the laws of the Commonwealth of Pennsylvania.

10.     At all material times relevant to this action, Defendant Pennsylvania Task Force 1 (hereinafter, "PATF1") is a domestic non-profit governmental agency duly existing under the laws of the Commonwealth of Pennsylvania.

11.     At all material times relevant to this action, Defendant, Ken Pagurek, Jr. (hereinafter, "Pagurek") is the Program Manager and a member of the Philadelphia Fire Department and Special Operations Command and was the Plaintiff's direct supervisor or a general supervisor who at all times held supervisory authority over the Plaintiff at PATF1.

12.     At all material times relevant to this action, Defendant, Brian Booth, (hereinafter, "Booth") is the Grant Manager and a member of the Philadelphia Fire Department, and the Plaintiff's direct supervisor or a general supervisor who at all times held supervisory authority over the Plaintiff at PATF1.

13.     At all material times relevant to this action, Defendant, Bob Stakem (hereinafter, "Stakem") is the Director of Public Safety, The Plaintiff's direct supervisor or a general supervisor who at all times held supervisory authority over The Plaintiff at HACC.

## PROCEDURAL HISTORY

14.     The Plaintiff, by and through her attorney, simultaneously filed a charge against the Defendants with the Equal Employment Opportunity Commission (hereinafter, the "EEOC"), the Pennsylvania Human Relations Commission (hereinafter, the "PHRC"), and the Philadelphia Commission on Human Relations (hereinafter, the "PCHR").

15.     On May 17, 2022, the Plaintiff received a Notice of Right to Sue Within 90 Days from the EEOC. *See, EEOC Right to Sue Letter,* attached hereto as **Exhibit "A"**.

16.     This action is commenced within 90 days of receipt of the EEOC Right to Sue Letter.

## STATEMENT OF FACTS

17.     The Plaintiff was hired by PATF1 and began work on December 7, 2017, as a FEMA Grant Administrative Specialist.

18.     The Plaintiff accepted the employment based on an understanding that this position was an introductory position with the intention for promotion to a Grant Manager classification level.

19.     Up until the Spring of 2019, the Plaintiff felt that her work was respected and that her management was pleased with her.

20.     On or about the Spring of 2019, the Plaintiff had excelled in her position and inquired about possible advancement. the Plaintiff requested a desk audit of her classification and compensation rate with Pagurek. The Plaintiff's responsibilities increased as well as her workload, however, her classification and compensation rate were not equally raised.

21.     Pagurek did not pursue any audit or review of the Plaintiff's classification or compensation. He refused to increase her hourly rate to match the level of work that the Plaintiff was providing.

22.     Instead, Pagurek told the Plaintiff that she should be happy with her current compensation, that she was already making more than if she worked for the city, and that she was already making the same as new firefighters fresh out of the academy. Pagurek told the Plaintiff that she should be happy with her compensation because she could be working at Burger King and making less money.

23.     The Plaintiff understood the Burger King comment to be an inuendo that because she suffers from attention-deficit/hyperactivity disorder (hereinafter, "ADHD"), she should be grateful that she was working for Pagurek.

24.     From the beginning of her employment, Pagurek and Booth knew that the Plaintiff had been diagnosed with ADHD and would frequently interrupt the Plaintiff as she worked on reports and projects and continuously insinuated that she could be terminated and replaced by them.

25.     During the Plaintiff's three years of employment at PATF1, Pagurek and Booth were condescending, harassing and abusive in their behavior towards the Plaintiff often making comments about her mental health condition and later regarding her physical appearance as an overweight woman.

26.     Pagurek and Booth sent the Plaintiff unsolicited emails about free things that she could do in Philadelphia and was told how lucky she was to be making her current rate.

27.     On or about April 19, 2019, Pagurek told the Plaintiff that if he were her father, he would tell her that she that already had a "great gig" and to not push it.

28.     Pagurek then compared his base salary with the Plaintiff's total compensation including base salary and benefits and stated that it would not be right for her to make more than he did.

29.     These comments made the Plaintiff feel embarrassed, frustrated, belittled and insulted in her place of business.

30.     An employee of the HACC named Dan Hartman assisted with data entry for the grant's office and was paid $50.00 per hour. His responsibilities were a fraction of The Plaintiff's workload; however, the Plaintiff was only making $28.00 per hour. Pagurek approved Mr. Hartman's rate for non- response work.

31.     Pagurek then told the Plaintiff to make a bid for a salary and agree to never get yearly annual raises. Pagurek, Booth, and Stakem threatened that if the salary bid was too high, that they would terminate her employment.

32.     The Plaintiff again asked for a review and audit of her classification and compensation through HACC's Human Resource Department. she was forced to make these requests to Pagurek and was not permitted to reach out to HACC's Human Resource Department to make this request.

33.     Over a year later, on or about the Spring of 2020, the Plaintiff finally had a meeting to discuss the audit. Pagurek, Booth, and Stakem again threatened termination of The Plaintiff's employment if she continued to pursue the review and audit with HACC's Human Resource Department. The Plaintiff was told that her compensation would not be changed and that she should just continue to do her job. This meant that she was forced to continue to be lead for all grant management work at PATF1 but not be classified or compensated as a Grant Manager.

34.     The Plaintiff still wanted to pursue a review so that she could receive the audit to have her classification/compensation level specifically identified. This audit would show that she was being unfairly and inadequately compensated for her work. A comparison between her compensation and male co-workers' compensations would show the disparity and that that it was at least partially based on her gender and mental

health disability.

35.     This meeting caused the Plaintiff to feel threatened, anxious, degraded stressed, embarrassed, and emotional.

36.     The Plaintiff was then issued a severe correction action plan that was comprised of false allegations.

37.     One allegation stated that the Plaintiff had refused to take a FEMA required Grant Management Training. The truth is that the Plaintiff was eager to take that training, however, Pagurek and Booth refused to allow funding through a grant to pay for the courses. Per PATF1's policy, the grant is supposed to cover the costs of these trainings.

38.     As a Grant Manager, Booth was also required to take the training courses. Pagurek approved the funding for BOOTH to take those courses, even though he would not approve the same courses for the Plaintiff.

39.     PATF1 was about to be audited by the federal government and Pagurek and Booth's refusal to fund these courses for the Plaintiff would have come out, which is why the erroneous allegations were formally brought against the Plaintiff.

40.     After this severe correction action plan, the hostile work environment and harassment only increased.

41.     Booth and Mr. Hartman were held to a different standard than the Plaintiff. Booth was not held accountable for missing deadlines or for mistakes in his work, and Mr. Hartman was not criticized for errors in his work. However, the Plaintiff was scrutinized about even the most minor of clerical errors.

42.     Both Pagurek and Booth knew that the Plaintiff had been diagnosed with ADHD but they would frequently interrupt the Plaintiff as she worked on reports and projects.

43.     During the Plaintiff's three years of employment at PATF1, Pagurek and Booth were

condescending and abusive in their behavior towards the Plaintiff.

44.     On or about February 27, 2018, Pagurek sent the Plaintiff an email with a link about how to eat without shame, stating, "thought you'd find this interesting."

45.     On or about May 3, 2019, Pagurek began a conversation with the Plaintiff about apple cider vinegar gummers that are good for weight loss.

46.     On or about July 9, 2019, Pagurek told the Plaintiff about a supplement that his girlfriend was selling that increased energy and helped with weigh loss.

47.     On or about February 24, 2020, Pagurek very loudly announced, "well, look who's large and in charge!" to the Plaintiff's co-workers; referring to the Plaintiff working alone in the grant office for an extended period of time and her the fact that she was over-weight.

48.     On or about September 3, 2020, Pagurek and Booth scheduled a meeting with the Plaintiff so they could speak with her with about her anti-social behavior and her severe depression. This same day, Pagurek sent the Plaintiff an email that had a website link for mental health resources. This email was also a notification to Stakem at HACC, wherein Pagurek stated that The Plaintiff was "struggling".

49.     On or about September 4, 2020, Pagurek asked the Plaintiff if she had signed up for mental health treatment.

50.     On or about September 5, 2020, Pagurek asked the Plaintiff again if she had signed up for mental health treatment. These questions were asked loudly, while standing in a common area outside of the Plaintiff's office. Pagurek asked the Plaintiff about whether she was seeing a psychologist or psychiatrist and what medication she was taking. This was all said loudly and easily for anyone to hear. Pagurek also told the Plaintiff that the Philadelphia Fire Department requires all superiors to have a full listing of all employees' medications and treatments.

51.     These conversations made the Plaintiff feel embarrassed, anxious, stressed, and emotional.

These questions were completely inappropriate for Pagurek to be asking and it was made even worse that they were done loudly to intentionally embarrass the Plaintiff in front of her co-workers.

52.     Frequently, Pagurek would initiate conversations at the lunch table about a female who was sleeping with several members of the Philadelphia Fire Department and how they called her "Kelly Bluebook."

53.     On or about October 6, 2020, Pagurek initiated a conversation with two male co-workers that discussed another co-worker's overweight wife. Pagurek stated, "I don't know, it might be fun with a fat chick." This was stated loudly outside of the Plaintiff's office right in front of her. The Plaintiff's office had a glass window so it was easy to see who was speaking and would have made it easy for Pagurek to see that the Plaintiff was sitting at her desk. This is only one example of the many loud conversations that Pagurek would have in front of the Plaintiff's office where he talked about having sex with "fat females."

54.     These conversations made the Plaintiff feel belittled, embarrassed, stressed, anxious, degraded, and emotional.

55.     On or about October 13, 2020, Pagurek initiated a conversation with the Plaintiff suggesting that she ride her bike to work instead of driving her "hooptie ride." Pagurek told the Plaintiff that riding a bike was good exercise and "would help take the weight off."

56.     These unsolicited, inappropriate conversations and comments made the Plaintiff feel embarrassed, belittled, anxious, and degraded.

57.     On or about November 30, 2020, the Plaintiff sent an email to HACC's Human Resource Department and notified them of the hostile work environment and harassment that she faced from Pagurek and Booth. The Plaintiff noted many of the examples listed above. Additionally, the Plaintiff told HACC's Human Resource Department that Pagurek and Booth have told the Plaintiff that they could send her away for her depression like they do to people in the Philadelphia Fire Department. Pagurek and Booth also sent

the Plaintiff unsolicited emails with job opportunities outside of PATF1. These emails made the Plaintiff feel even more alienated at her place of employment.

58.     Despite the Plaintiff notifying HACC's Human Resource Department, nothing was done about the harassment or the hostile work environment. Neither Pagurek nor Booth faced any disciplinary actions or were even asked to stop their abusive behavior towards the Plaintiff. The Plaintiff could not work in that environment any longer and suffer the unlawful treatment by her managers. She felt that her only recourse was to leave her employment.

59.     On or about December 9, 2020, the Plaintiff had a phone conversation with Elgin Thomas at HACC's Human Resource Department. Following that conversation, the Plaintiff sent an email to Elgin Thomas, formally resigning from her position with PATF1 and HACC.

60.     On or about December 10, 2020, the Plaintiff had a follow-up phone conversation with Elgin Thomas regarding the Plaintiff's classification, compensation level, and resignation. The Plaintiff also sent Elgin Thomas a follow-up email regarding the same.

61.     On or about December 11, 2020, the Plaintiff had a phone conversation where she requested a full listing of the confirmed work and responsibilities that she had performed, but such information was not given to her.

62.     Without this information the Plaintiff is unable to claim GS13 level work experience, and this has impacted her financially as well as obstructed The Plaintiff's search for employment.

63.     While employed with HACC and PATF1, the Plaintiff only had one meeting with management for a performance review. This is against HACC's policy.

64.     While employed with HACC and PATF1, the Plaintiff only had one annual raise in her three years of employment. This is also against HACC policy. The policy stated that raises should be based on the amount of the grant and how much could be paid, however, Pagurek refused to raise the Plaintiff's salary as

it would then be closer to his own.

65.     During the beginning of the COVID-19 pandemic, the Plaintiff and another female employee were denied hazard pay that HACC was providing to essential employees via congressional grant funds. As an essential worker with HACC, the Plaintiff and the other female employee were entitled to that hazard pay.

66.     Both Pagurek and Booth received hazard pay that was charged to the PEMA (Pennsylvania Emergency Management Agency) response for the COVID-19 response.

67.     Elderly male HACC employees were dismissed from the office temporarily and paid unemployment due to COVID-19. The Plaintiff and another female co-worker were told that if they were uncomfortable with working in the office, then they could go on furlough and would not receive unemployment benefits.

68.     On or about February 2018, Booth was absent from work for the entire month. The Plaintiff was expected to perform Booth's duties; however, she was not compensated at the appropriate rate for that time period. Per HACC policy, the Plaintiff should have been paid at a Grant Manager level while performing those tasks.

69.     On or about February 2019, Booth was again absent from work for the entire month. The Plaintiff was expected to perform Booth's duties; however, she was not compensated at the appropriate rate for that time period. Per HACC policy, the Plaintiff should have been paid at a Grant Manager level while performing those tasks.

70.     On or about February 2020, Booth was absent from work for three entire months.

71.     As a result, the Plaintiff was expected to perform Booth's duties; however, she was not compensated at the appropriate rate for that time period. Per HACC policy, she should have been paid at a Grant Manager level while performing those tasks.

72.     The Plaintiff filed for Unemployment Benefits with the Pennsylvania Department of Labor and Industry.

73.     On or about July 19, 2021, she received a letter from the Pennsylvania Department of Labor and Industry stating that she qualified for benefits even though she voluntarily quit her job with HACC and PATF1.

74.     The Pennsylvania Department of Labor and Industry letter states that after an investigation, they found that she had left her job due to harassment in the workplace.

75.     The letter also stated a finding that she had notified her employer, but the "employer did not take action to resolve the issue" and this left her "with no reasonable alternative but to separate from employment."

76.     The Defendants' actions caused the the Plaintiff to feel extremely humiliated, degraded, victimized, embarrassed and emotionally distressed.

77.     The Defendants' conduct is in conflict with Federal Law, State Law, and the internal policies of both PATF1 and HACC.

78.     As a result of the acts and conduct complained of herein, the Plaintiff has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits and other compensation which such employment entails, and the Plaintiff also suffered future pecuniary losses, emotional pain, humiliation, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. The Plaintiff has further experienced severe emotional and physical distress.

79.     As the Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, the Plaintiff demands Punitive Damages as against all of the Defendants, jointly and severally.

80.     The above are just some examples, of some of the discrimination to which the Defendants

subjected the Plaintiff.

81.    The Defendants' conduct created a hostile work environment for the Plaintiff. The Plaintiff felt victimized by workplace and sexual harassment by the Defendants.

82.    The Defendants have exhibited a pattern and practice of not only gender, sexual and disability discrimination, but also retaliation, hostile work environment and constructive termination.

83.    The Defendants' conduct led to the unlawful termination of the Plaintiff as she was left with no alternative but to leave her employment to escape the abuse that she suffered.

**COUNT I**
**VIOLATION OF THE PHRA FOR SEXUAL**
**AND GENDER DISCRIMINATION, HOSTILE**
**WORK     ENVIRONMENT,     UNLAWFUL**
**TERMINATION**
***(Against all Defendants)***

84.    The Plaintiff hereby incorporates herein, by reference thereto, paragraphs 1 through 83, as though the same were set forth herein at length.

85.    The Pennsylvania Human Rights Act (hereinafter, the "PHRA") states that:

> For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required.

43 Pa. Stat. Ann. § 955(a).

86.    Defendants Pagurek and Booth discriminated against the Plaintiff by making comments that were objectively offensive with respect to the Plaintiff's sex or gender, and which would not have been made had she been a male. (*See, ex.,* ¶¶ 48-51, 56-60).

87.     The discrimination was objectively severe and pervasive, and detrimentally affected the Plaintiff by causing her distress and creating a hostile workplace.

88.     *Respondeat superior* liability is established as the Plaintiff reported this discrimination to the HACC Human Resource Department, and no corrective or preventative action was taken by the HACC.

89.     The PHRA in § 955(d) provides that it shall be an unlawful discriminatory practice:

> For any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act.

90.     As a result of all of the above, the Plaintiff was treated negatively by the Defendants because her sex or gender with respect to and including but not limited to: salary, promotions, opportunity for advancement, and workplace environment.

WHEREFORE, the Plaintiff asserts that the Defendants engaged in unlawful violations against her, as to merit compensatory damages, emotional damages, damages for physical harm, attorney's fees, punitive damages or any other legal or equitable relief as the court deems appropriate.

### COUNT II
### VIOLATION OF TITLE VII FOR SEXUAL AND GENDER DISCRIMINATION, HOSTILE WORK ENVIRONMENT, UNLAWFUL TERMINATION
#### (*Against all Defendants*)

91.     The Plaintiff hereby incorporates herein, by reference thereto, paragraphs 1 through 83, as though the same were set forth herein at length.

92.     Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment because

of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

93.     Defendants Pagurek and Booth discriminated against the Plaintiff by making comments that were objectively offensive with respect to the Plaintiff's sex or gender, and which would not have been made had she been a male. (*See, ex.,* ¶¶ 48-51, 56-60).

94.     The discrimination was objectively severe and pervasive, and detrimentally affected the Plaintiff by causing her distress and creating a hostile workplace.

95.     *Respondeat superior* liability is established as the Plaintiff reported this discrimination to the HACC Human Resource Department, and no corrective or preventative action was taken by the HACC.

96.     The PHRA in § 955(d) provides that it shall be an unlawful discriminatory practice:

> For any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act.

97.     As a result of all of the above, the Plaintiff was treated negatively by the Defendants because her sex or gender with respect to and including but not limited to: salary, promotions, opportunity for advancement, and workplace environment.

WHEREFORE, the Plaintiff asserts that the Defendants engaged in unlawful violations against her, as to merit compensatory damages, emotional damages, damages for physical harm, attorney's fees, punitive damages or any other legal or equitable relief as the court deems appropriate.

## COUNT III
### VIOLATION OF THE PHRA FOR DISABILITY DISCRIMINATION, HOSTILE WORKPLACE
### (*Against all Defendants*)

98.     The Plaintiff hereby incorporates herein, by reference thereto, paragraphs 1 through 83, as though the same were set forth herein at length.

99.     The Pennsylvania Human Rights Act (hereinafter, the "PHRA") states that:

> For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required.

43 Pa. Stat. Ann. § 955(a).

100.    Further, Section 4(p.1) of the PHRA defines "the term 'handicap or disability,' [as]: (1) a physical or mental impairment which substantially limits one or more of such person's major life activities; (2) a record of having such an impairment; or (3) being regarded as having such an impairment[.]" 43 P.S. § 954(p.1).

101.    In addition, under Section 1630.4(a)(1) of the Americans with Disabilities Act (ADA) Regulations:

> It is unlawful for a covered entity to discriminate on the basis of disability against a qualified individual in regard to:
>
> […]
>
> (ii) Hiring, upgrading, promotion, award of tenure, demotion, transfer, layoff, termination, right of return from layoff, and rehiring;
>
> [...]
>
> (ix) Any other term, condition, or privilege of employment.

29 C.F.R. § 1630.4(a)(1) (emphasis added).

102.    "The term 'qualified,' with respect to an individual with a disability, means that the

individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position." Section 1630.2(m) of the ADA Regulations, 29 C.F.R. § 1630.2(m).

103.    Moreover, Pennsylvania courts have repeatedly recognized that disability discrimination cases brought under the PHRA are interpreted in line with the ADA.

104.    In general, both the ADA and the PHRA prohibit a covered entity from discriminating against a "qualified individual" because of a disability. 42 U.S.C. § 12112(a); 43 P.S. § 955.

105.    The Plaintiff suffers from depression and ADHD, which was known to the Defendants.

106.    Both Pagurek and Booth frequently interrupted the Plaintiff when she was working, although they were aware of the fact that those interruptions made it more difficult for her to perform her job duties than if she did not suffer from ADHD.

107.    In addition, Pagurek made comments that the Plaintiff reasonably understood to be referencing her ADHD disability in a negative way. (*See, ex.,* ¶¶ 26-27).

108.    Furthermore, Pagurek and Booth made comments referencing her depression, both publicly and privately, that the Plaintiff reasonably understood to be referencing her depression disability in a negative way and exposing her to ridicule with other employees. (*See, ex.* ¶¶ 52-55, 61).

109.    *Respondeat superior* liability is established as the Plaintiff reported this discrimination to the HACC Human Resource Department, and no corrective or preventative action was taken by the HACC.

110.    The PHRA in § 955(d) provides that it shall be an unlawful discriminatory practice:

>   For any person, employer, employment agency or labor organization
>   to discriminate in any manner against any individual because such
>   individual has opposed any practice forbidden by this act, or because
>   such individual has made a charge, testified or assisted, in any
>   manner, in any investigation, proceeding or hearing under this act.

111.    As a result of all of the above, the Plaintiff was treated negatively by the Defendants because of a perceived disability with respect to and including but not limited to: salary, promotions, opportunity for advancement, and workplace environment.

WHEREFORE, the Plaintiff asserts that the Defendants engaged in unlawful violations against her, as to merit compensatory damages, emotional damages, damages for physical harm, attorney's fees, punitive damages or any other legal or equitable relief as the court deems appropriate.

### COUNT IV
### VIOLATION OF THE ADA FOR DISABILITY DISCRIMINATION
### (*Against all Defendants*)

112.    The Plaintiff hereby incorporates herein, by reference thereto, paragraphs 1 through 83, as though the same were set forth herein at length.

113.    Under the ADA, "discrimination" can include (but is not limited to):

>   (1) limiting, segregating, or classifying a job applicant or employee in a way
>   that adversely affects the opportunities or status of such applicant or
>   employee because of the disability of such applicant or employee;
>
>   […]
>
>   (5)(A) not making reasonable accommodations to the known physical or
>   mental limitations of an otherwise qualified individual with a disability who
>   is an applicant or employee, unless such covered entity can demonstrate that
>   the accommodation would impose an undue hardship on the operation of
>   the business of such covered entity…

42 U.S.C.A. § 12112(b).

114.    The Plaintiff suffers from depression and ADHD, which was known to the Defendants.

115.    Both Pagurek and Booth frequently interrupted the Plaintiff when she was working, although they were aware of the fact that those interruptions made it more difficult for her to perform her job duties than if she did not suffer from ADHD.

116.    In addition, Pagurek made comments that the Plaintiff reasonably understood to be referencing her ADHD disability in a negative way. (*See, ex.,* ¶¶ 26-27).

117.    Furthermore, Pagurek and Booth made comments referencing her depression, both publicly and privately, that the Plaintiff reasonably understood to be referencing her depression disability in a negative way and exposing her to ridicule with other employees. (*See, ex.* ¶¶ 52-55, 61).

118.    As a result, the Plaintiff was treated negatively by the Defendants because of perceived disabilities.

119.    *Respondeat superior* liability is established as the Plaintiff reported this discrimination to the Human Resource Department, and no corrective or preventative action was taken.

120.    As a result of all of the above, the Plaintiff was treated negatively by the Defendants because of a perceived disability with respect to and including but not limited to: salary, promotions, opportunity for advancement, and workplace environment.

WHEREFORE, the Plaintiff asserts that the Defendants engaged in unlawful violations against him, as to merit compensatory damages, emotional damages, damages for physical harm, attorney's fees, punitive damages or any other legal or equitable relief as the court deems appropriate.

## COUNT IV
## FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (*Against all Defendants*)

121.     The Plaintiff hereby incorporates herein, by reference thereto, paragraphs 1 through 83, as though the same were set forth herein at length.

122.     Intentional Infliction of Emotional Distress is a tort defined as:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm results from it, for such bodily harm. The standard for judging the existence of intent for infliction of emotional distress is whether the actor desires to inflict severe emotional distress and also where he knows that such distress is certain, or substantially certain, to result from his conduct. It applies also where he acts recklessly, in deliberate disregard of a high degree of probability that the emotional distress will follow.

*See*, Restatement (Second) of Torts, § 46 (1965).

123.     Pagurek and Booth made negative and belittling comments against the Plaintiff with respect to her weight, sex or gender, depression, and/or ADHD.

124.     These comments were a proximate cause of the Plaintiff's emotional distress.

125.     Some of these comments were made publicly and within earshot of other employees.

126.     Pagurek and Booth each had a duty to keep the Plaintiff's disability information confidential; however, they violated that duty, causing the Plaintiff emotional distress.

127.     The Defendants' breach of duty was the result of purposeful conduct.

128.     The Defendants' breach of duty was a direct and proximate cause of the physical and emotional injuries suffered by the Plaintiff.

129.     The Defendants' breach of duty irrevocably tarnished the Plaintiff's reputation within the workplace.

130.    The Defendants' breach of duty caused the Plaintiff to feel isolated and ridiculed among fellow employees.

131.    *Respondeat superior* liability is established as the Plaintiff reported this discrimination to the HACC Human Resource Department, and no corrective or preventative action was taken by the HACC.

132.    As the direct result of Defendants' actions, the Plaintiff suffered injuries, including but not limited to emotional pain and suffering, sleep deprivation, emotional distress, and other continuing injuries, and the Plaintiff continues to suffer traumatic emotional effects.

WHEREFORE, the Plaintiff asserts that the Defendants engaged in unlawful violations against him, as to merit compensatory damages, emotional damages, damages for physical harm, attorney's fees, punitive damages or any other legal or equitable relief as the court deems appropriate.

### COUNT V
### VIOLATION OF THE PHRA FOR RETALIATION PERCEIVED AND ACTUAL
#### (*Against all Defendants*)

133.    The Plaintiff hereby incorporates herein, by reference thereto, paragraphs 1 through 83, 85 through 90, and 99 through 111, as though the same were set forth herein at length.

134.    The Plaintiff acted in good faith when reporting unlawful acts and wrongdoings to the HACC Human Resource Department (hereinafter, the "Reports").

135.    These Reports constituted protected actions under the PHRA.

136.    The Plaintiff was retaliated against by the Defendants in response to the Reports.

137.    The retaliation endured by the Plaintiff would dissuade a reasonable employee from making complaints of discrimination and harassment.

WHEREFORE, the Plaintiff asserts that the Defendants engaged in unlawful violations

against her, as to merit compensatory damages, emotional damages, damages for physical harm, attorney's fees, punitive damages or any other legal or equitable relief as the court deems appropriate.

## COUNT VI
### VIOLATION OF TITLE VII FOR RETALIATION PERCEIVED AND ACTUAL
### (*Against all Defendants*)

138.    The Plaintiff hereby incorporates herein, by reference thereto, paragraphs 1 through 83, and 92 through 97, as though the same were set forth herein at length.

139.    The Plaintiff acted in good faith when reporting unlawful acts and wrongdoings to the HACC Human Resource Department (hereinafter, the "Reports").

140.    These Reports constituted protected actions under the PHRA.

141.    The Plaintiff was retaliated against by the Defendants in response to the Reports.

142.    The retaliation endured by the Plaintiff would dissuade a reasonable employee from making complaints of discrimination and harassment.

WHEREFORE, the Plaintiff asserts that the Defendants engaged in unlawful violations against her, as to merit compensatory damages, emotional damages, damages for physical harm, attorney's fees, punitive damages or any other legal or equitable relief as the court deems appropriate.

## COUNT VII
### VIOLATION OF THE ADA FOR RETALIATION PERCEIVED AND ACTUAL
### (*Against all Defendants*)

143.    The Plaintiff hereby incorporates herein, by reference thereto, paragraphs 1 through 83, and 113 through 120, as though the same were set forth herein at length.

144.    The Plaintiff acted in good faith when reporting unlawful acts and wrongdoings to the HACC Human Resource Department (hereinafter, the "Reports").

145.    These Reports constituted protected actions under the PHRA.

146.    The Plaintiff was retaliated against by the Defendants in response to the Reports.

147.    The retaliation endured by the Plaintiff would dissuade a reasonable employee from making complaints of discrimination and harassment.

WHEREFORE, the Plaintiff asserts that the Defendants engaged in unlawful violations against her, as to merit compensatory damages, emotional damages, damages for physical harm, attorney's fees, punitive damages or any other legal or equitable relief as the court deems appropriate.

**COUNT VIII**
**VIOLATION     OF     THE     PHRA     FOR**
**UNLAWFUL          TERMINATION          –**
**CONSTRUCTIVE DISCHARGE**
(***Against all Defendants***)

148.    The Plaintiff hereby incorporates herein, by reference thereto, paragraphs 1 through 83, 85 through 90, 99 through 111, and 134 through 137 as though the same were set forth herein at length.

149.    Constructive discharge occurs if the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign.

150.    The Plaintiff was discriminated against on the basis sex or gender and disabilities, as recounted previously.

151.    The Plaintiff was retaliated against for reporting this discrimination to the Human Resources Department.

152.     As a result of the discrimination and retaliation, the Plaintiff was forced to resign from her position.

WHEREFORE, the Plaintiff asserts that the Defendants engaged in unlawful violations against her, as to merit compensatory damages, emotional damages, damages for physical harm, attorney's fees, punitive damages or any other legal or equitable relief as the court deems appropriate.

<u>**COUNT IX**</u>
**VIOLATION OF TITLE VII FOR UNLAWFUL TERMINATION – CONSTRUCTIVE DISCHARGE**
(***Against all Defendants***)

153.     The Plaintiff hereby incorporates herein, by reference thereto, paragraphs 1 through 83, 92 through 97, and 139 through 142, as though the same were set forth herein at length.

154.     Constructive discharge occurs if the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign.

155.     The Plaintiff was discriminated against on the basis sex or gender and disabilities, as recounted previously.

156.     The Plaintiff was retaliated against for reporting this discrimination to the Human Resources Department.

157.     As a result of the discrimination and retaliation, the Plaintiff was forced to resign from her position.

WHEREFORE, the Plaintiff asserts that the Defendants engaged in unlawful violations against her, as to merit compensatory damages, emotional damages, damages for physical harm, attorney's fees, punitive damages or any other legal or equitable relief as the court deems

appropriate.

## COUNT X
## VIOLATION OF THE ADA FOR UNLAWFUL TERMINATION – CONSTRUCTIVE DISCHARGE
### (*Against all Defendants*)

158.    The Plaintiff hereby incorporates herein, by reference thereto, paragraphs 1 through 83, 113 through 120, and 144 through 147, as though the same were set forth herein at length.

159.    Constructive discharge occurs if the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign.

160.    The Plaintiff was discriminated against on the basis sex or gender and disabilities, as recounted previously.

161.    The Plaintiff was retaliated against for reporting this discrimination to the Human Resources Department.

162.    As a result of the discrimination and retaliation, the Plaintiff was forced to resign from her position.

WHEREFORE, the Plaintiff asserts that the Defendants engaged in unlawful violations against him, as to merit compensatory damages, emotional damages, damages for physical harm, attorney's fees, punitive damages or any other legal or equitable relief as the court deems appropriate.

## JURY DEMAND

Plaintiff requests a jury trial on all triable issues.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff demands judgment against the Defendants, jointly and severally, in an amount to be determined at the time of trial plus interest, including but not limited

to all emotional distress and economic damages, punitive damages, liquidated damages, compensatory damages, statutory damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

By: /s/ Andres Jalon, Esquire
   Andres Jalon, Esq.
   JALON & ASSOCIATES
   17 W. Airy Street
   Norristown, Pennsylvania 19401
   ajalon@jalonesq.com

   /s/ Rook Elizabeth Ringer, Esquire
   Rook Elizabeth Ringer, Esq.
   Florida Bar No. 1015698
   THE LAW OFFICE OF ROOK RINGER
   222 San Marco Ave., Ste. "C"
   St. Augustine, FL 32084
   904.265.7665 (Office)
   904.677.7812 (Fax)
   rook@ringer.law

Dated: August 15, 2022 (*Pro hac vice* pending)